UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

RODNEY LEE MONTGOMERY,     )
           )
     Plaintiff,     )
           )
     v.     )     Case No. 1:22CV801
           )
SERGEANT GARY HUNT, et al.,     )
           )
     Defendants.     )
           )

<u>MEMORANDUM OPINION AND RECOMMENDATION</u>
<u>AND ORDER OF UNITED STATES MAGISTRATE JUDGE</u>

This is a *pro se* civil rights action filed under 42 U.S.C. § 1983 by Plaintiff Rodney Lee Montgomery, an inmate in the custody of the North Carolina Department of Correction. Plaintiff contends that three detention officers, sued here as Defendants, assaulted him using pepper spray and physical force without cause in violation of the Eighth Amendment. Currently pending before the Court are Motions for Summary Judgment by Defendant Gary Hunt [Doc. #84] and Defendant Ronald Reese [Doc. #77]. In response to Defendants' Motions for Summary Judgment, Plaintiff filed a Memorandum entitled "Memorandum in Support of his Motion for Summary Judgment" [Doc. #88], which the Court construes as his Opposition to Defendants' Motions for Summary Judgment. For the foregoing reasons, the Court recommends that Defendants' Motions for Summary Judgment be granted as to the official capacity claims and denied as to the individual capacity claims.

Plaintiff's claims are set out in his Complaint [Doc. #2], which describes two use of force incidents that occurred the evening of June 23, 2022,[1] and names as defendants three detention officers at Scotland Correctional Institute ("Scotland") where Plaintiff is incarcerated: Sergeants Ronald Reese and Gary Hunt, and Correctional Officer Derrick Hicks.[2] Specifically, in Claim One, Plaintiff alleges that Sergeants Hunt and Reese excessively sprayed him with OC pepper spray after Plaintiff was refused a dinner meal tray and asked to

---

[1] In their Motions for Summary Judgment, Defendants describe another use of force incident that occurred around 9:30 a.m. on June 23, 2022, several hours prior to the events that serve the basis for Plaintiff's claims in this case. (See Reese Br., Doc. #78 at 1-3; Hunt Br., Doc. #85 at 1.) In response to Defendants' discussion of the earlier incident, Plaintiff provided more detailed factual information about the use of force incident that occurred on the morning of June 23, 2022, in his Memorandum opposing summary judgment. (Pl.'s Opp., Doc. #88 at 1-7.) That incident involved Plaintiff's altercation with a guard that resulted in an injury to Plaintiff's elbow and ear. However, the Court notes that Plaintiff did not plead any claims with respect to the morning incident, nor did he move to amend his Complaint to add these claims. (See Compl, Doc. #2.) Moreover, even if Plaintiff had, the record before the Court indicates that none of the named Defendants were personally involved in the first incident. (See Incident Report, Doc. #88-2 at 46, 38-39, 41, 40, 43, 42, 7.) To prevail in a § 1983 action, the plaintiff must "'affirmatively show[] that the official charged acted personally in the deprivation of the plaintiff's rights,'" Ramsey v. Betha, No. 1:22CV610, 2024 WL 4651819, at *8 (M.D.N.C. Nov. 1, 2024) (quoting Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985)), and without evidence that the Defendants were present during, or participated in, the first incident, "no reasonable trier of fact could find that [Defendants'] 'own individual actions' violated the Constitution.'" Williamson v. Stirling, 912 F.3d 154, 172 (4th Cir. 2018). Thus, based on Plaintiff's failure to assert claims with respect to the morning incident, and the fact that none of the Defendants in the present case appear to have been involved in the morning incident, the Court proceeds with its analysis of Plaintiff's claims based only on the use of force incidents that took place during the afternoon and evening of June 23, 2022.

[2] Plaintiff initially named as Defendants Gary Hunt, Ronald Reese, and "John Doe." (See Compl., Doc. #2 at 1.) In December 2022, Plaintiff subsequently filed a Motion for Leave to File Amended Complaint seeking the Court's permission to substitute references to "John Doe" in the Complaint to "Officer Hicks." (Motion for Leave, Doc. #10.) The Court granted Plaintiff's Motion, and references to "John Doe" in the Complaint were amended to "Officer Hicks." (Order, Doc. #11.)

On June 7, 2023, a summons was issued to Officer Derrick Hicks. Defendant Hicks was served on July 14, 2023. (See Returned Executed Summons, Doc. #29.) To date, Defendant Hicks has not Answered or otherwise responded to Plaintiff's Complaint. On April 4, 2024, Plaintiff filed a Declaration for Entry of Default (Doc. #60) seeking default judgment as to Defendant Hicks. On April 9, 2024, the Court entered an Order staying consideration of Plaintiff's Declaration for Entry of Default until after the Court's consideration of any dispositive motions. In light of the conclusion that claims should proceed to trial, the Court will consider the issue of counsel for Defendant Hicks. Therefore, counsel for Defendant Hunt, appearing for the North Carolina Department of Justice, will be directed to coordinate with the North Carolina Department of Justice to contact Defendant Hicks and determine if the state will be providing a defense. A report on this determination must be filed by February 28, 2025.

see a supervisor. (Compl., Doc. #2 at 5-7.)[3] In Claim Two, Plaintiff alleges that after he was pepper sprayed, Sergeant Reese and Officer Hicks assaulted Plaintiff in the decontamination shower by punching him in the jaw and head and kicking Plaintiff's "head, face, hips, stomach and chest and rib-cage area." (Id. at 7-9.)

I.    FACTS AND EVIDENCE

    A.  Plaintiff's Facts[4]

    On June 23, 2022, Plaintiff was being escorted to his cell following a medical visit to Memorial Hospital when he was approached by Defendant Hunt, who ordered Plaintiff to remove the shoes he was wearing. (Compl., Doc. #2 at 5; Grievance, Doc. #88-2 at 64; Pl.'s Opp, Doc. #88 at 8.) Plaintiff complied, removed his shoes, and walked barefoot the rest of the way to his cell in Scotland's Lower Red Unit. (Compl., Doc. #2 at 6; Grievance, Doc. #88-2 at 64; Pl.'s Opp, Doc. #88 at 8.) After reaching his cell and being locked in, Plaintiff

---

[3] For ease of reference, cited page numbers will refer to the sequential numbers generated by the Court's Electronic Case Filing ("ECF") system.

[4] The Court notes the "general rule" that "when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion." Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). "However, a *verified* complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." Id. (emphasis in original).

Here, Defendant Reese contends that Plaintiff's Complaint is unverified (Reese Br., Doc. #78 at 12, 13.) The allegations in the Complaint are clearly based on Plaintiff's personal knowledge. In addition, Plaintiff signed the Complaint, and then following the hand-written recitation of his claims in his Complaint, Plaintiff wrote the following: "I Rodney Montgomery declare under penalty of perjury that the foregoin state is accrute and true." (Compl., Doc. #2 at 11.) Although Plaintiff did not sign and date this attestation, Plaintiff signed the Complaint and wrote the attestation, including his own name, to verify the Complaint. Moreover, in his Response Brief, Plaintiff provided his own sworn Declaration as well as the sworn Declaration of witnesses and other records. Thus, the Court notes that although it considers Plaintiff's verified Complaint in making its recommendations on summary judgment, Plaintiff does not rest on "mere allegations" of misconduct, (Reese Br., Doc. #78 at 13 (quoting Oliver v. Baity, 208 F. Supp. 3d 681, 686 (M.D.N.C. 2016)), and instead offered evidence, including sworn affidavits, administrative grievances, and medical records, which corroborate his allegations.

asked Defendant Hunt for his dinner tray, and Defendant Hunt told Plaintiff that dinner was over and that he would not provide Plaintiff with anything to eat. (Compl., Doc. #2 at 6; Montgomery Decl. ¶ 2, Doc. #88-1; Grievance, Doc. #88-2 at 65; Pl.'s Opp., Doc. #88 at 8; Roberts Decl. ¶¶ 1-2, Doc. #88-2 at 51.) When Plaintiff then requested to see the officer-in-charge, he was "bombarded with a big can of OC pepper spray right into [his] facial area," which just "kept coming." (Compl., Doc. #2 at 6; Pl.'s Opp., Doc. #88 at 8; Grievance, Doc. #88-2 at 65; Roberts Decl. ¶¶ 3-4, Doc. #88-2 at 51; <u>see</u> Montgomery Decl. ¶ 2, Doc. #88-1.) Plaintiff turned to the sink in his cell and began to wash his face with water, but when he lifted his head from the sink, another burst of OC pepper spray was sprayed through the cell door. (Compl., Doc. #2 at 6; Pl.'s Opp., Doc. #88 at 8; Grievance, Doc. #88-2 at 65; <u>see</u> Roberts Decl. ¶ 4, Doc. #88-2 at 51.) When Plaintiff approached his cell window to see who was administering the pepper spray, he saw Defendant Hunt and two female officers standing outside his cell, overcome with "overwhelming laugher." (Compl., Doc. #2 at 6-7; Pl.'s Opp., Doc. #88 at 8; Grievance, Doc. #88-2 at 66.) Plaintiff turned back to the sink but was "discombobulated" and turning in circles in his cell when he was sprayed a third time. (Compl., Doc. #2 at 7; Pl.'s Opp, Doc. #88 at 9; Grievance, Doc. #88-2 at 66; Roberts Decl., ¶ 5, Doc. #88-2 at 51.) The pepper spray made the floor of Plaintiff's cell slippery, causing him to "slip and slide barefooted" and fall to the ground, "slamming [his] right knee on the concrete floor." (Compl., Doc. #2 at 7; Grievance, Doc. #88-2 at 66; Pl.'s Opp., Doc. #88 at 9.) Defendant Reese told Plaintiff to "cuff up", Plaintiff complied, and Plaintiff was "rough-house[d]" out of his cell. (Compl., Doc. #2 at 7; Grievance, Doc. #88-2 at 66; Pl.'s Opp., Doc. #88 at 9.) Defendant Reese told Plaintiff, "I'm going to do what they should have done

4

earlier," and after Plaintiff responded that he had not done anything, Defendant Reese said, "I seen the video." (Compl., Doc. #2 at 7; Grievance, Doc. #88-2 at 66-67; Pl.'s Opp., Doc. #88 at 9.) Defendants Reese and Hicks escorted Plaintiff to Scotland's receiving area to be decontaminated, and Defendant Reese kept telling Plaintiff that he had seen the video (apparently referencing a video of Plaintiff's altercation with a guard earlier that day), and then repeatedly told Plaintiff that he "suppose to be in here jumping on the white boys." (Compl., Doc. #2 at 7-8; Grievance, Doc. #88-2 at 67-68; Pl.'s Opp., Doc. #88 at 9.)

At the receiving area, Plaintiff was taken to shower stall two to decontaminate, and then given clean clothing to change into. (Compl., Doc. #2 at 8; Grievance, Doc. #88-2 at 69; Montgomery Decl. ¶ 3, Doc. #88-1; Pl.'s Opp., Doc. #88 at 9.) After he was dressed in the clean clothes, Defendant Reese placed handcuffs on Plaintiff and "pretended like [he was] going to exit the shower stall," but instead Defendant Reese "blind-sid[ed] [Plaintiff] with his fist to the left side of [his] jaw and head area." (Compl., Doc. #2 at 9; Grievance, Doc. #88-2 at 69-70; Montgomery Decl. ¶ 4, Doc. #88-1; Pl.'s Opp., Doc. #88 at 10.) Defendant Hicks then "joined in the assault," and both defendants "bombard[ed] [Plaintiff] with their fist[s] to the facial and head area, knocking [Plaintiff] to the shower floor" while Plaintiff was still hand-cuffed, and then proceeded to kick Plaintiff's "head, face, hips, stomach and chest and rib-cage area." (Compl., Doc. #2 at 9; Grievance, Doc. #88-2 at 69; Montgomery Decl. ¶ 4, Doc. #88-1; Pl.'s Opp., Doc. #88 at 10.)

After the assault, Defendants Reese and Hicks left Plaintiff on the shower floor. (Compl., Doc. #2 at 9; Grievance, Doc. #88-2 at 70; Pl.'s Opp., Doc. #88 at 10.) Plaintiff alleges that Defendant Hicks asked Defendant Reese, "what do you want to do with him?"

and Defendant Reese responded, "leave him there, come on! Let's go fix-up the paperwork." (Compl., Doc. #2 at 9; Grievance, Doc. #88-2 at 70; Montgomery Decl. ¶ 6, Doc. #88-1; Pl.'s Opp., Doc. #88 at 10.) At some point later, Defendant Reese came back to the shower stall for Plaintiff and took him to medical, where the nurse told Defendant Reese to "take him right back." (Compl., Doc. #2 at 10; Grievance, Doc. #88-2 at 70; Pl.'s Opp., Doc. #88 at 10.) Defendant Reese took Plaintiff back to the receiving area.[5] (Compl., Doc. #2 at 10; Grievance, Doc. #88-2 at 70; Pl.'s Opp., Doc. #88 at 10.) Plaintiff was then taken to Memorial Hospital for evaluation and treatment for his "head, face, and body trauma." (Compl., Doc. #2 at 10.)

B. Defendants' Facts

Defendants do not dispute that Plaintiff was maced, but contend that Defendants Hunt and Reese each sprayed one burst of OC pepper spray only after Plaintiff refused direct orders to stop kicking his cell door. Defendant Reese denies using any force on Plaintiff during decontamination. Specifically, Defendants contend that around 5:15 p.m. on June 23, 2022, Plaintiff began kicking his cell door. (Reese Aff. ¶ 4, Doc. #78-3; Hunt Witness Statement, Doc. #78-9 at 2.) Defendant Hunt responded to Plaintiff's cell and, because Plaintiff's behavior created a "security risk by damaging the working mechanisms and locking system of the door," he ordered Plaintiff to stop, which Plaintiff refused. (Reese Aff. ¶ 4, Doc. #78-3;

---

[5] Plaintiff's timeline after he was escorted out of the receiving area is unclear. In his Complaint and grievance statement, Plaintiff states that when Defendant Reese escorted him to medical, the nurse told Defendant Reese to "take him right back," so Defendant Reese took Plaintiff back to receiving. (Compl., Doc. #2 at 10; Grievance, Doc. #88-2 at 70.) At some point, however, Plaintiff was evaluated by nurse Angela Mercer before he was taken to Memorial Hospital. (See Mercer Witness Statement, Doc. #88-2 at 92.) Nurse Mercer's statement stated that the "nursing assessment reflects visible injuries to the face." (Id.) Similarly, the medical records for Scotland reflect an evaluation at the facility, indicating Plaintiff "Appears in Pain, Visible Injury . . . [,] Left side of face and eye edema/redness . . . ." (Medical Records, Doc. #78-16 at 3.) In a grievance narrative about the incident, Plaintiff stated that he only "remember[s] bits and parts of seeing the nurse supervisor . . . and being at the Scotland Hospital," (Grievance, Doc. #88-2 at 70), and the hospital records do indicate some "associated loss of consciousness" (Medical Records, Doc. #78-17 at 2).

6

Hunt Witness Statement, Doc. #78-9 at 3.) Defendant Hunt then administered one burst of OC pepper spray into Plaintiff's cell. (Hunt Witness Statement, Doc. #78-9 at 1.) Plaintiff still refused to stop kicking his cell door, so Defendant Hunt called for assistance, and multiple additional officers, including Defendant Reese, responded to Plaintiff's cell. (Hunt Witness Statement, Doc. #78-9 at 2; Reese Aff. ¶ 4, Doc. #78-3.) When Defendant Reese arrived, Plaintiff was still engaging in "disruptive" behavior, including "kicking his cell" and "throwing water from the toilet." (Hunt Witness Statement, Doc. #78-9 at 2; Reese Aff. ¶ 5, Doc. #78-3.) Defendant Reese ordered Plaintiff to stop his behavior and to submit to handcuffs, which Plaintiff again refused. (Reese Aff. ¶ 5, Doc. #78-3.) Defendant Reese then administered another burst of OC pepper spray into Plaintiff's cell, after which Plaintiff submitted to handcuffs. (Hunt Witness Statement, Doc. #78-9 at 2-3; Reese Aff. ¶¶ 7-8, Doc. #78-3.) Defendants Reese and Hicks escorted Plaintiff to Scotland's intake processing[6] where he was decontaminated, given new clothes, and photographed. (Reese Aff. ¶¶ 8-9, Doc. #78-3; Hicks Witness Statement, Doc. #78-2 at 2; <u>see</u> Photos of Plaintiff, Doc. #78-15 at 2-5.) Defendant Reese denies using any force against Plaintiff while he was being decontaminated. (Reese Aff. ¶ 9, Doc. #78-3.) Specifically, with respect to Plaintiff's contention that Reese punched him in the face and then kicked him on the shower floor while he was in handcuffs, Defendant Reese does not contend that such efforts were necessary to maintain order; instead Defendant Reese denies this occurred, and states that "[a]t no time did I ever strike or kick Plaintiff."

---

[6] It appears that the Parties use the terms "receiving area" and "intake processing" to refer to the same room. The Court uses the term "intake processing" in its own analysis, but to the extent the Court cites to either party's use of "receiving area" as used in their pleadings or briefing, the Court does so intending to refer to "intake processing."

(Reese Aff. ¶ 9, Doc. #78-3.) After decontamination, Defendants Reese and Hicks escorted Plaintiff to medical for evaluation. (Reese Aff. ¶ 10, Doc. #78-3; Hicks Witness Statement, Doc. #78-2 at 2.)

Defendant Reese submitted video footage from two cameras at Scotland that he asserts support his version of the facts: footage from the Lower Red Housing Unit, where Plaintiff's cell was located, from 5:22 p.m. to 5:25 p.m., when Plaintiff was sprayed with OC pepper spray by Defendants Hunt and Reese (see Camera 150 Footage); and footage from intake processing, where Plaintiff was taken to be decontaminated, from 5:24 p.m. to 5:52 p.m. (Camera 38 Footage).[7] None of the footage has audio.

The surveillance footage from the Lower Red Housing Unit shows a male guard, presumably Defendant Hunt, entering the unit at 5:22 p.m. accompanied by two female officers. (Camera 150 Footage at 5:22:26-40.) Defendant Hunt walks straight to one cell, presumably Plaintiff's, leans in towards the door, and appears to speak into the cell, although the cell door remains closed. (Id. at 5:22:40-54.) Due to the location of Plaintiff's cell behind a staircase, Defendant Hunt's actions outside the cell are largely obscured, but the footage captures Defendant Hunt reach into a small black pouch attached to his belt and pull out a silver canister. (Id. at 5:22:54.) At this point, the two female guards who entered the unit with Defendant Hunt approach the cell, and their position between the camera and Defendant

---

[7] Defendant Reese submitted the footage as exhibits 4, 10, and 14 to his Brief in Support of his Motion for Summary Judgment. However, the footage was submitted via flash drive. Accordingly, when referring to the video footage, the Court will cite to the camera number, not Defendant's exhibit number or the corresponding ECF document number. Defendant Reese additionally submitted footage from a third camera, which covers corridor A119, and depicts the use of force incident that occurred the morning of June 23, 2022. (See Camera 5 Footage.) This incident does not serve as the basis of Plaintiff's allegations, and the Court accordingly does not summarize this footage.

Hunt further obscure Defendant Hunt's actions from view. (Id. at 5:22:57-5:23:15.) As a result, the footage does not capture Defendant Hunt deploying the pepper spray, but it does show that about twenty seconds after Defendant Hunt pulled the canister out of the pouch, he starts to put it back in the pouch, but then immediately withdraws it again. (Id. at 5:23:13-15.) Soon after, a fourth officer responds to Plaintiff's cell, and one of the originally responding female officers walks away from Plaintiff's cell. She appears to be smiling. (Id. at 5:23:57-5:24:02.) Over the next thirty seconds, Defendant Hunt remains outside Plaintiff's cell with two other officers and continues to peer inside. The officers behind him appear to be laughing. (Id. at 5:24:00-37.) At this point, the female officer who left the unit returns with two new officers, all of whom proceed to Plaintiff's cell. (Id. at 5:24:40.) For nearly a minute, the officers stand around Plaintiff's cell, completely obscuring the door and their actions from the camera's view. At 5:25 p.m., the door to Plaintiff's cell opens and Plaintiff, who is barefoot and handcuffed, is escorted out by one of the responding officers, presumably Defendant Reese or Defendant Hicks. (Id. at 5:25:30-45; see Grievance, Doc. #88-2 at 66; Hicks Witness Statement, Doc. #78-12 at 2; Reese Aff. ¶ 8, Doc. #73-8.)

The surveillance footage from intake processing shows Plaintiff being escorted into intake processing by two officers, presumably Defendants Reese and Hicks, at 5:27 p.m.[8]

---

[8] Plaintiff is first seen entering intake processing in the mirror on the lower left-hand side of the screen. Defendant Reese contends that the "remaining interaction between Plaintiff, Sergeant Reese, and Officer Hicks can be observed in the mirror located on the upper-right hand screen, above the mailboxes." (Reese Br., Doc. #78 at 4.) As recommend by Defendant Reese, the Court zoomed in on the mirror to better view the interaction that Defendant Reese contends is visible. Defendant Reese, Defendant Hicks, and Plaintiff are somewhat visible in the mirror in the upper right-hand corner, but at approximately 5:28, only a few seconds after they enter intake processing, the three men disappear from the footage completely. As described above, Defendants Reese and Hicks are seen periodically over the next ten minutes, but Plaintiff is not seen again on the footage for nine minutes, until 5:37 p.m. Despite Defendant Reese's contentions, the footage does not appear to capture the "remaining interaction" between Plaintiff and Defendants Reese and Hicks.

(Camera C38 Footage, 5:27:46.) As captured in a small mirror in the upper-right hand side of the surveillance, Plaintiff and Defendants Reese and Hicks stand in intake processing but just outside a doorway leading to another room for several seconds, at which point the footage glitches, and the three men completely disappear.[9] (Id. at 5:27:51-5:28:16.) At approximately 5:30 p.m., one of the officers reenters intake processing, retrieves gray and white linens, and then stands outside the decontamination room speaking with two other guards. (Id. at 5:29:54-5:30:43.) Several seconds later, the footage glitches again, and the three guards, including the two officers who escorted Plaintiff into intake processing, presumably Defendants Hicks and Reese, walk away from the decontamination room. (Id. at 5:31:04.) From 5:31 p.m. to 5:37 p.m., Defendants Hicks and Reese are seen chatting with other guards and looking at paperwork. (Id. at 5:31-5:37.) At 5:37 p.m., nine minutes after he was last seen on the footage at 5:28 p.m., Plaintiff is escorted through intake processing, handcuffed and barefoot, by Defendants Reese and Hicks and out a door on the opposite side of the intake area. (Id. at 5:37:53.) At 5:41 p.m., Defendants Reese and Hicks escort Plaintiff back into intake processing and towards the door to the room where Plaintiff was originally left. (Id. at 5:41:34-5:42:03.) The video glitches again, and Plaintiff disappears, although it appears he may have entered a doorway adjacent to the decontamination room. (Id. at 5:42:03.) Defendants Reese and Hicks leave intake processing at 5:42 p.m. (Id. at 5:42:33-38.) The footage continues until 5:52 p.m., but Plaintiff and his escorting officers do not appear again.

---

[9] The Court notes that in reviewing all of the C38 Camera Footage for the overall time frame from 5:24 to 5:52, it appears that the C38 Camera Footage jumps, or glitches, 12 times. Based on the camera's clock, these jumps appear to be anywhere from 8 seconds to 2 minutes. There is no indication of intentional manipulation of the footage, but the Court does note that the footage does not appear to provide a complete record in light of these jumps.

C.  Medical Records

Plaintiff and Defendant Reese both submitted Plaintiff's medical records in support of their respective positions.[10]  Based on these records, Plaintiff presented to the Emergency Department at Memorial Hospital at around 7:00 p.m. on June 23, 2022 with complaints of "assault" with "trauma to the face mostly left sided[,] chest and abdomen[,] associated loss of consciousnesses." (Medical Records, Doc. #89 at 2.)  Doctors at Memorial Hospital ran labs and a series of tests, including head, pelvic, chest, facial bones, and spinal CT scans.  (Medical Records, Doc. #78-17 at 8-20.)  Plaintiff's examination showed "[g]eneralized ecchymosis and edema left zygomatic region," chest wall tenderness, abdominal tenderness, and "signs of injury present." (Medical Records, Doc. #78-17 at 3-4.)  Plaintiff's head CT scan showed "left frontal and left parietal scalp soft tissue swelling" (id. at 8, 19-20); Plaintiff's CT scan of the chest, abdomen and pelvis showed "soft tissue swelling over the left mid back and flank, consider bruising, hematoma" (id. at 14-16); and Plaintiff's facial bone CT revealed "moderate left malar and facial soft tissue swelling" to Plaintiff's "maxillofacial soft tissue tissues" (id. at 18-19).[11]

Plaintiff was signed out and left Memorial Hospital "against medical advice," and was returned back to Scotland. (Id. at 9.)  According to North Carolina Department of Public Safety ("NCDPS") records from Plaintiff's return to Scotland, Plaintiff's discharge diagnosis

---

[10] There is overlap between the Parties' submissions, although neither submission is completely duplicated. Where Plaintiff and Defendants submitted the same evidence, the Court cites to Plaintiff's submission; where the evidence was submitted by only one Party, the Court cites to that evidence accordingly.

[11] The record also includes the medical records for Plaintiff's first visit to Memorial Hospital earlier that day. By comparison, it appears that these injuries were not present earlier in the day, when Plaintiff was treated following the morning altercation, and Defendants do not contend otherwise.

11

from Memorial Hospital was: "Assault, Concussion with Loss of Consciousness, Chest Wall Pain and Contusion of Abdominal Wall." (Medical Records, Doc. #89 at 35.)  Plaintiff was prescribed Motrin and Lorcet for pain management.  (Id.)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party.  Id.  The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact."  Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact."  Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).

In this case, as discussed above, Defendant Reese relies on video evidence reflecting the events that occurred on June 23, 2022, in support of his Motion for Summary Judgment. As the Supreme Court has noted, video evidence presents an "added wrinkle" on summary judgment.  Scott v. Harris, 550 U.S. 372, 378, 380 (2007) (internal citations omitted).  That is, "when a video quite clearly contradicts the version of the story told by the plaintiff . . . so that no reasonable jury could believe it, a court should not adopt that version of events for the

12

purposes of ruling on a motion for summary judgment." Simmons v. Whitaker, 106 F.4th

379, 385 (4th Cir. 2024) (internal quotations and brackets omitted); Witt v. W. Va. State Police,

Troop 2, 633 F.3d 272, 276 (4th Cir. 2011). However, when a video "does not blatantly

contradict [a plaintiff's] account of the facts," it "must be taken in the light most favorable to

[the plaintiff] at summary judgment." Simmons, 106 F.4th at 385-86 (citing Scott, 550 U.S. at

378-80).

## III. DISCUSSION

### A. Official Capacity Claims

Plaintiff sues Defendants in their individual and official capacities (Compl., Doc. #2 at

3-4), and Defendants Hunt and Reese contend that Plaintiff's official capacity claims should

be dismissed (Reese Br., Doc. #78 at 7; Hunt Br., Doc. #85 at 5).[12]  Defendant Hunt is correct

that official capacity claims raised under § 1983 against state officials are generally claims

against the state itself.  Hafer v. Melo, 502 U.S. 21, 25-26 (1991) ("[A]n official-capacity suit

against a state officer 'is not a suit against the official but rather is a suit against the official's

office. As such it is no different from a suit against the State itself.'" (quoting Will v. Michigan

Dep't of State Police, 491 U.S. 58, 71 (1989)).  The Supreme Court has held that "state officials,

sued for monetary relief in their official capacities" are not "persons" subject to suit

---

[12] Defendant Reese argues that Plaintiff's official capacity claims should be dismissed because Defendant Reese
was not acting pursuant to Scotland's official custom or policy, and he did not possess "final authority" over
any such custom or policy. (Reese Br., Doc. #78 at 7.) The Court notes that Defendant Reese's arguments are
generally considered in the context of Monell liability for municipalities, as claims against municipal officers in
their official capacity are treated as claims against the municipality. Here, however, Defendants are *state*
detention officers employed by the North Carolina Department of Public Safety, and where a *state* officer is
sued for money damages in his official capacity, the claim is treated as a claim against the state. This issue was
raised by the state in Defendant Hunt's Motion for Summary Judgment, and would apply to all official capacity
claims against state officers. Thus, the Court recommends dismissal of Plaintiff's official capacity claims against
all Defendants.

under § 1983.  Id. (citing Will, 491 U.S. 58); see also Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 329 (4th Cir. 2001) (citing Alden v. Maine, 527 U.S. 706, 727-28 (1999)) ("The Supreme Court has recognized that the doctrine of sovereign immunity under the Eleventh Amendment extends beyond the literal text of the Eleventh Amendment to prevent a state from being sued by one of its own citizens without its consent.").  Thus, Plaintiff's official capacity claims should be dismissed.  The Court therefore considers Plaintiff's claims below only as claims against the Defendants in their individual capacity.

   B.  Eighth Amendment Excessive Force Claims

   The Eighth Amendment's prohibition against cruel and unusual punishments extends to the treatment of prisoners by prison officials.  Hill v. Crum, 727 F.3d 312, 317 (4th Cir. 2013); Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).  "In this context, . . . the Eighth Amendment forbids the unnecessary and wanton infliction of pain."  Hill, 727 F.3d at 317 (internal quotation omitted).  "An inmate's Eighth Amendment claim involves a subjective component and an objective component."  Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008).  Thus, to prevail in an excessive force action, an inmate must show that "the prison official acted with a sufficiently culpable state of mind (subjective component)" and that "the deprivation suffered or injury inflicted . . . was sufficiently serious (objective component)."  Id. (quotation omitted).

   "On summary judgment, the inquiry under the subjective component boils down to whether a reasonable jury could determine that an officer acted with malice, applying force punitively and 'for the very purpose of causing harm.'"  Dean v. Jones, 984 F.3d 295, 302 (4th Cir. 2021) (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)).  In Whitley v. Albers, the

14

Supreme Court "set forth four non-exclusive factors to assist courts in assessing whether an officer has acted with 'wantonness':

    (1) 'the need for the application of force';

    (2) 'the relationship between the need and the amount of force that was used';

    (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and

    (4) 'any efforts made to temper the severity of a forceful response.'"

Iko, 535 F.3d at 239 (quoting Whitley, 475 U.S. at 321). "Prison officials are given a certain amount of discretion in decisions to use force" because "they are frequently called upon to maintain order, quell disturbances, and act in haste, under pressure … frequently without the luxury of a second chance." Geddings v. Roberts, 1:15CV264, 2018 WL 1626116, at *9 (M.D.N.C. Mar. 30, 2018) (internal citations and quotations omitted). However, the "deference that is afforded to prison administrators 'does not insulate from review actions taken in bad faith or for no legitimate purpose,'" and "[d]eference to prison officials does not give them constitutional license to torture inmates." Williams, 77 F.3d at 765 (quoting Whitley, 574 U.S. at 322).

The objective component "measures the nature of the force employed, asking whether that force was sufficiently serious to establish a cause of action." Dean, 984 F.3d at 302 (internal quotation omitted); Wilkins v. Gaddy, 559 U.S. 34, 38-39 (2010) (noting that the injuries inflicted must be "nontrivial"). Although "not every malevolent touch by a prison guard gives rise to a federal cause of action," Wilkins, 559 U.S. 34 at 37-38, "there is no 'significant injury' threshold to sustain an excessive force claim because a de minimis injury, if

15

the product of malicious and sadistic use of force, can sustain the claim." <u>Parker v. Stevenson</u>, 625 F. App'x 196, 198 (4th Cir. 2015) (citation omitted). Moreover, the objective component is "'contextual and responsive to contemporary standards of decency,' and is always satisfied 'when prison officials maliciously and sadistically use force to cause harm.'" <u>Greene v. Feaster</u>, 733 F. App'x 80, 81 (4th Cir. 2018) (internal bracket omitted) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 8-9 (1992)); <u>Williams</u>, 77 F.3d at 762.

      i.    <u>Use of OC Pepper Spray by Defendants Hunt and Reese</u>

     Defendants Hunt and Reese contend that their use of OC pepper spray was not excessive, and that Plaintiff suffered only *de minimis* injuries as a result. Applying the <u>Whitley</u> factors, the Court finds that there are genuine issues of material fact that preclude summary judgment.

     With respect to the first and second <u>Whitley</u> factors, the need for the use of force and the relationship between the need and the amount of force used, Defendants contend that their use of pepper spray was necessary and proportionate because Plaintiff was kicking his cell door, which posed a "security risk by damaging the working mechanisms and locking system of the door," (Reese Aff. ¶ 4, Doc. #78-3; Hunt Witness Statement, Doc. #78-9 at 3), and Plaintiff disobeyed repeated orders from Defendant Reese, Defendant Hunt, and other responding officers to stop kicking the cell door. (Reese Br., Doc. #78 at 9; Hunt Br., Doc. #85 at 7.) However, none of Plaintiff's evidence, including his own declaration and an affidavit from an inmate who observed the incident from a cell near Plaintiff's, indicates that

16

Plaintiff was kicking his cell door or refusing orders to stop.[13]  Rather, Plaintiff contends that

he asked for dinner, and then asked to see the officer in charge when Defendant Hunt refused

to provide him any food, after which he was sprayed with three prolonged bursts of OC

pepper spray while officers outside his cell laughed.  Cf. Seabrooks v. Cooper, No. 0:07-3101-

CMC-MAGCIV, 2008 WL 4414250, at *3-4 (D.S.C. Sept. 23, 2008) (finding defendant

demonstrated "need for the application of force" where he administered "one short burst of

mace" and plaintiff "[did] not deny that he was kicking his cell door" and "expected to be

sprayed with mace" as a result).

      In addition, the video surveillance of the incident falls far short of blatantly

contradicting Plaintiff's version of the facts.  Without sound, the footage of the Lower Red

Unit sheds no light on whether Plaintiff asked for dinner, was refused food, and then asked

to see the officer in charge, or whether Plaintiff kicked his cell door and refused direct orders

to stop.  In addition, because the view of the outside of Plaintiff's cell is partially obscured by

a staircase and the position of the responding officers, it is not clear from the footage how

many bursts of OC pepper spray were administered and whether Plaintiff was refusing to

comply with orders or was given time to comply between bursts.  Moreover, the footage

appears to provide *support* for some of Plaintiff's allegations.  For example, Plaintiff contends

that after he was sprayed with a second burst of pepper spray, he turned to the window of his

cell to see who was administering the spray and observed Defendant Hunt with two female

officers laughing at him.  (Compl., Doc. #2 at 7; Grievance, Doc. #88-2 at 66.)  The

---

[13] In his brief, Defendant Hunt states that it is "undisputed that Plaintiff was kicking his cell door" and cites to his own witness statement in support of his contention.  (Hunt Br., Doc. #85 at 7.)  The Court has found no evidence in the record where Plaintiff concedes that he was kicking his cell door.

surveillance footage shows that Defendant Hunt responded to Plaintiff's cell with two female officers, whose faces were mostly obscured, but one of whom was visibly smiling when she turned to face the camera, and the video further reflects other officers laughing behind Defendant Hunt over the next 30 seconds.  (See Camera 150 Footage, 5:22:30-5:24.)

Thus, viewing the evidence, including the video footage, see Simmons, 106 F.4th at 383-86, in the light most favorable to Plaintiff, there are material disputes of fact as to whether Defendants needed to deploy mace at all, let alone three bursts.  "[A]lthough it is not *per se* unconstitutional for guards to spray mace at prisoners confined in their cells," it is "generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole infliction of pain."  Williams, 77 F.3d at 763 (internal quotation and citation omitted).  Where, as here, a reasonable jury could find that Defendants' use of mace was greater than necessary or for the sole infliction of pain, summary judgment is not appropriate and such questions should be left for the jury to decide.  See, e.g., Dean, 984 F.3d at 304-05.

The third Whitley factor, the "reasonably perceived" threat that the use of force was intended to quell, likewise counsels against summary judgment.  Defendants contend that due to Plaintiff's disciplinary history (see NCPDS Offender Infractions Report, Doc. #78-2) and his placement on Scotland's restrictive Red Housing Unit, Plaintiff "engaged in improper patterns of behavior that gave rise to the need for the application of force."  (Reese Br., Doc. #78 at 9; Hunt Br., Doc. #85 at 8.)  Assuming, as the Court must at this stage, that Plaintiff did not kick his cell door or refuse to obey orders, Plaintiff's history of disobedience and his placement on Red Unit are not independently sufficient to find that Defendants reasonably

18

perceived a threat from Plaintiff, who was inside his locked cell, that warranted three bursts of mace.

Finally, turning to the fourth <u>Whitley</u> factor, whether efforts were made to temper the severity of the force used, including whether a less severe response was unsuccessful, Defendants argue that they complied with Scotland's use of force policy by first ordering Plaintiff to stop kicking his cell door and only deployed the OC pepper spray after Plaintiff refused to comply. (Hunt Br., Doc. #85 at 8-9; Reese Br., Doc. #78 at 12; <u>see</u> Scotland Policies, Doc. #85-1 at 19-22.) Compliance with an institutional policy "is not, of course, a constitutional requirement and so compliance with [a policy] would not necessarily demonstrate that the defendants acted constitutionally." <u>Williams</u>, 77 F.3d at 766. However, compliance "would provide powerful evidence that the application of force was tempered and that the officers acted in good faith" in deploying the pepper spray. <u>Id.</u> Scotland's use of force policy authorizes use of OC pepper spray on a recalcitrant inmate after a verbal warning, but it also provides that use of "OC Pepper Spray is unnecessary and excessive if an Officer faces no reasonable difficulty controlling an offender" and prohibits OC Pepper spray from being used "maliciously or as punishment." (Scotland Policies, Doc. #85-1 at 19, 21-23.) Here, as discussed, there are material disputes of fact as to whether Defendants Hunt and Reese complied with policy and administered the pepper spray only after Plaintiff engaged in prohibited behavior and disobeyed verbal orders, or whether Defendants Hunt and Reese violated policy and administered the spray maliciously and without cause. Where Defendants' compliance with policy is disputed, summary judgment is inappropriate. <u>See</u> <u>Williams</u>, 77 F.3d at 766. ("The critical flaw in the officers' argument is [that] . . . [t]heir compliance with [policy],

rather than being uncontroverted, is hotly disputed. . . . This severely undermines their position that summary judgment was proper.") Thus, whether Defendants Hunt and Reese took efforts to temper the severity of the forceful response is disputed.

Ultimately, having considered all four Whitley factors, the Court concludes that there are genuine issues of fact with regard to the subjective component of the Eighth Amendment analysis, "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21 (internal quotation omitted).

Further, with regard to the objective component, that is whether the force used was sufficiently serious to establish a cause of action, Defendants contend that "Plaintiff sustained, at most, swelling and redness around his eyes," and that these injuries "prove that the force used" was not excessive. (Hunt Br., Doc. #85 at 9; Reese Br., Doc. #78 at 12 (citing Photos of Plaintiff, Doc. #78-15)). As noted above, "what matters" in the objective inquiry "is the severity of the *force* applied" rather than the "severity of an inmate's *injuries*." Dean, 984 F.3d at 303 (emphasis in original). The Fourth Circuit has repeatedly held that a "reasonable jury could find that a sustained blast of pepper spray directly to the face constitutes something more than de minimis force." Id. (citing Greene, 733 F. App'x at 81-82). There is no dispute that Plaintiff was sprayed in the face with at least two bursts of OC pepper spray, and that use of force is sufficiently serious to consider in an excessive force claim.

Based on the foregoing, and viewing the evidence in the light most favorable to Plaintiff, a trier of fact could find that Defendants deployed the OC pepper spray "wantonly and maliciously" for the purpose of causing harm, and that the use of force was "sufficiently

serious" to sustain a claim. Therefore, the Motions for Summary Judgment on Plaintiff's claims against Defendants Hunt and Reese for excessive force based on their use of OC pepper spray should be denied.

      ii.    <u>Assault by Defendants Reese and Hicks</u>

Plaintiff also contends that he was assaulted by Defendants Reese and Hicks in the decontamination shower. Defendant Reese, relying on the video footage of intake processing, denies assaulting Plaintiff in the decontamination shower and contends that Plaintiff has not produced sufficient evidence to support his allegations. (Reese Br., Doc. #78 at 12-13.) The Court disagrees and finds that there are disputes of material fact that preclude summary judgment on this issue. First, as described in detail above, in addition to his verified complaint, Plaintiff submitted a sworn declaration, a copy of his administrative grievance laying out similar facts, and medical records that establish Plaintiff suffered injuries consistent with the assault he describes. <u>See e.g.</u>, <u>Parker</u>, 625 F. App'x at 199 (finding material disputes of fact precluding summary judgment where a *pro se* plaintiff produced a personal affidavit describing the alleged excessive force, a prison grievance describing the incident in a similar manner, and an affidavit from a fellow inmate supporting plaintiff's allegations).

Defendant Reese specifically challenges the evidence in Plaintiff's medical records, contending that Plaintiff "made no complaints to his medical providers that he had been kicked or struck on any part of his body," and that the records "do not reflect any acute or traumatic injury to Plaintiff's head, face, hips, stomach, chest, rib cage, or stomach." (Reese Br., Doc. #78 at 13.) Again, the Court disagrees. Plaintiff's medical records show that he was first evaluated at Scotland and told the nurse, "They beat me," and he appeared "in pain" with

"Visible Injury" and "Left side of face and eye edema/redness." (Medical Records, Doc. #78-16 at 2-3.) Plaintiff was taken to the hospital and presented at Memorial Hospital for "assault" with "trauma to the face mostly left sided[,] chest and abdomen[,] associated loss of consciousnesses." (Medical Records, Doc. #89 at 2.) Following head, pelvic, facial bone, and spinal CT scans, doctors found that Plaintiff had soft tissue swelling on his head and facial bones, abdomen and pelvis, and chest. (Medical Records, Doc. #78-17 at 8, 19-20, 14-15, 18-19.) Although Plaintiff returned to Scotland later that evening, his injuries were serious enough that he did so "against medical advice," (id. at 9), and with a discharge diagnosis of "Assault, Concussion with Loss of Consciousness, Chest Wall Pain and Contusion of Abdominal Wall" (Medical Records, Doc. #89 at 35). Plaintiff's medical records clearly reflect physical injuries at least plausibly consistent with the assault he alleges, and without any alternative explanation from Defendant Reese about the source of Plaintiff's injuries, the Court cannot find that Plaintiff's medical records fail to provide support for his claims of assault by Defendants Reese and Hicks.

The video footage of intake processing also does not blatantly contradict Plaintiff's facts. To the contrary, Plaintiff is visible only for a short time, and he is only seen while entering and exiting intake processing. (See Camera C38 Footage.) Crucially, the footage does not capture shower stall two, where Plaintiff was taken to decontaminate and where Plaintiff alleges that he was assaulted. Moreover, to the extent the video footage shows Plaintiff's and Defendants Reese's and Hicks's actions, the footage again corroborates Plaintiff's allegations. Plaintiff is seen entering intake processing at 5:27 p.m., after which it appears that he is led to a room off intake processing, presumably with the decontamination

showers. At 5:31 p.m., the officers who escorted Plaintiff into intake processing, presumably Defendants Hicks and Reese, reenter intake processing without Plaintiff, and do not retrieve Plaintiff until 5:37 p.m. This timeline is consistent with Plaintiff's allegation that Defendants Reese and Hicks decontaminated Plaintiff, assaulted him, and left him alone on the shower floor while they "fixed up the paperwork" before taking him to medical for evaluation. (Compl., Doc. #2 at 9; Grievance, Doc. #88-2 at 70; Montgomery Decl. ¶ 5, Doc. #88-1.) Thus, viewing the evidence, including the video footage, in the light most favorable to Plaintiff, there is evidence in the record supporting Plaintiff's allegations.

In considering the subjective component of the Eighth Amendment claim, whether the use of force was a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm, the Court notes that Defendant Reese does not contend that the use of force was necessary or appropriate here, and instead contends that the alleged assault did not occur at all. Thus, with respect to the first and third Whitley factors, the need for the use of force and the extent of any reasonably perceived threat, Defendant Reese does not assert that force was necessary to "maintain or restore discipline," Iko, 535 F.3d at 239, nor does he "even assert that [Plaintiff] posed a threat to anyone" or that Plaintiff "verbally threatened the officers" or was "hostile in any way," Thompson v. Commonwealth of Virginia, 878 F.3d 89, 99-100 (4th Cir. 2017). Without any indication in the record that the use of force was justified, a reasonable jury could find that Defendant Reese's and Hicks's conduct was malicious. Similarly, with respect to the second Whitley factor, the relationship between the need to use force and the force applied, because Defendant Reese provided no reason to "need to use force, the force used was necessarily excessive in relation to the need."

Id. Finally, with respect to the fourth Whitley factor, efforts to temper the use of force, Defendant Reese does not contend that he used any force, let alone attempted to temper the use of such force.

Ultimately, Defendant Reese denies any use of force at all, while Plaintiff describes an unprovoked beating while he was handcuffed on the ground, which if true provides a sufficient basis to find that the force was applied punitively for the purpose of causing harm. Therefore, the Court concludes that there are genuine issues of fact with regard to the subjective component of the Eighth Amendment analysis, whether force was applied "maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21 (internal quotation omitted).

With respect to the objective component, the severity of the force, Plaintiff contends that he was subject to an unprovoked assault where he was punched and kicked in the head, face, hips, chest, and rib cage. This use of force quite clearly rises to the level of objective harm sufficient to establish a cause of action. See Dean, 984 F.3d at 302; Wilkins, 559 U.S. at 38 ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."); Williams, 77 F.3d at 765 ("Deference to prison officials does not give them constitutional license to torture inmates.").

Based on the foregoing, and viewing the evidence in the light most favorable to Plaintiff, a trier of fact could find that Defendants Reese and Hicks assaulted Plaintiff in the decontamination shower "wantonly and maliciously" for the purpose of causing harm, and that Plaintiff's subsequent injuries were "sufficiently serious" to sustain a cause of action. See

<u>Iko</u>, 535 F.3d at 239. Plaintiff's claims against Defendants Reese and Hicks for excessive force with respect to the assault in the decontamination shower should proceed.

C. <u>Qualified Immunity</u>

Defendants also assert the affirmative defense of qualified immunity. Qualified immunity shields government officials from liability for civil damages where their conduct does not violate a "statutory or constitutional right" that was "'clearly established'" at the time of the conduct." <u>Ashcroft v. Al-Kidd</u>, 563 U.S. 731, 735 (2011) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). A right is clearly established when "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" <u>Ashcroft</u>, 563 U.S. at 741 (internal brackets and quotations omitted). In the Eighth Amendment excessive force context, the Fourth Circuit has held that it is "clearly established that inmates have a 'right to be free from' the 'malicious' infliction of pain," and the law provides "fair notice to prison officials that they cannot, no matter their creativity, maliciously harm a prisoner on a whim or for reasons unrelated to the government's interest in maintaining order." <u>Brooks v. Johnson</u>, 924 F.3d 104, 119 (4th Cir. 2019) (quotation omitted); <u>Thompson</u>, 878 F.3d at 102 ("Defined at the appropriate level of specificity, prisoners have a right not to be assaulted by their captors. Under the Eighth Amendment, prisoners have a right to be free from maliciously or penologically unjustified infliction of pain and suffering." (citing <u>Rhodes v. Chapman</u>, 452 U.S. 337, 356 (1981))).

Here, Plaintiff has alleged facts from which a reasonable factfinder could conclude that Plaintiff's constitutional rights were violated when Defendants Hunt and Reese sprayed him with three bursts of OC pepper spray while in his cell without any provocation or need to

restore order, and that Defendants Reese and Hicks assaulted him in the decontamination shower. In addition, it was clearly established on June 23, 2022, that prison officials violate the Eighth Amendment when they use mace in greater quantities than necessary "or for the sole purpose of infliction of pain," <u>Greene</u>, 733 F. App'x at 82, and when they engage in "malicious, unprovoked, unjustified force inflicted on inmates who are compliant and restrained," <u>Thompson</u>, 878 F. 3d at 102-103. As described above, there is evidence in the record from which a jury could find that Defendants Hunt and Reese sprayed Plaintiff with three bursts of pepper spray without justification, acting wantonly and maliciously, and that Defendants Reese and Hicks assaulted Plaintiff in the decontamination shower wantonly and maliciously for the purpose of causing harm. Defendants are therefore not entitled to qualified immunity. <u>See e.g.</u>, <u>Brooks</u>, 924 F.3d at 118-120; <u>Thompson</u>, 878 F.3d 99-103.

VI.     CONCLUSION

Based on the foregoing, the Court finds that there are genuine issues of material fact precluding summary judgment on the individual capacity claims, but the official capacity claims should be dismissed since those are effectively claims against the state.

The Court also notes that Plaintiff previously moved for appointment of counsel, which the Court denied at the time without prejudice to further consideration later in the case. In light of this Recommendation, the Court will request assistance of counsel for Plaintiff pursuant to the Court's Pro Bono Plan, to represent Plaintiff at trial and for any pre-trial

preparation. The case will be referred to the Clerk to determine the availability of counsel to accept that request.

In addition, as noted above, Defendant Hicks was served but has not answered or otherwise responded. In light of the conclusion that Plaintiff's claims should proceed to trial, the Court will also consider the issue of counsel for Defendant Hicks. Therefore, counsel for Defendant Hunt, appearing for the North Carolina Department of Justice, will be directed to coordinate with the North Carolina Department of Justice to contact Defendant Hicks and determine if the state will be providing representation of Defendant Hicks pursuant to the Defense of State Employees Act.[14] A report on this determination must be filed by February 28, 2025.

IT IS THEREFORE RECOMMENDED that Defendants' Motions for Summary Judgment [Doc. #77, #84] be GRANTED to the extent that the official claims against all Defendants be dismissed, but DENIED as to the individual capacity claims.

IT IS ORDERED that Plaintiff's prior requests for appointment of counsel are GRANTED to the extent that the Court will request assistance of counsel for Plaintiff pursuant to the Court's Pro Bono Plan, to represent Plaintiff at trial and for any pre-trial preparation, and the case is referred to the Clerk to determine the availability of counsel to accept that request.

IT IS FURTHER ORDERED that counsel for Defendant Hunt, appearing for the North Carolina Department of Justice, is directed to coordinate with the North Carolina

---

[14] When the Court allowed withdrawal of the Special Deputy Attorney General as counsel, the Court noted that "if future developments in the case require coordination through the North Carolina Department of Justice, the Court will direct substitute counsel to contact [prior counsel] as necessary." (Order, Doc. #82.)

27

Department of Justice to contact Defendant Hicks and determine if the state will be providing representation of Defendant Hicks pursuant to the Defense of State Employees Act. A report on this determination must be filed by February 28, 2025.

This, the 28th day of January, 2025.

Joi Elizabeth Peake
United States Magistrate Judge